Wilhelmina Nordhaus, Appellee, v. Joseph A. Marek and Henry Newman, Appellants.

Gen. No. 42,386.

Opinion filed January 6, 1943.

EKERN, MEYER & MATTHIAS and WOLFF, KEANE & GOMBER, all of Chicago, and SEARS, O'BRIEN & STREIT, of Aurora, for appellants; DONALD L. THOMPSON, of Chicago, BARNABAS F. SEARS, of Aurora, and WILLIAM G. CHORN and THOMAS E. KEANE, both of Chicago, of counsel.

HIRSCH E. SOBLE, of Chicago, for appellee.

MR. JUSTICE HEBEL delivered the opinion of the court.

The petitioners and defendants, Joseph A. Marek and Henry Newman, filed a petition for leave to appeal from the order of the circuit court of Cook county granting plaintiff a new trial, which order was entered by said court on June 12, 1942.

The action was brought in the circuit court of Cook county by plaintiff Wilhelmina Nordhaus as mother of Charles Nordhaus, against defendants, petitioners, Joseph A. Marek and Henry Newman, to recover damages to her means of support on account of the death of the said Charles Nordhaus, pursuant to the statute commonly known as the Dram Shop Act (Ill. Rev. Stat. 1941, ch. 43, par. 135 [Jones Ill. Stats. Ann. 68.042]). In this proceeding, the plaintiff's amended complaint consists of one count and avers that on February 7, 1941 defendant Marek owned and operated a cocktail lounge and engaged in the business of selling at retail alcoholic liquors at 1059 N. Pulaski Road in the City of Chicago, and that on that date one Jean Wilkins was employed by the defendant to assist him in the operation of said business; that the defendant Henry Newman was the owner of the said building and knew that alcoholic liquors were being sold therein and had leased the premises to the defendant Marek

for such purpose; that on said date Marek, acting through his employee Wilkins, sold in said premises to one Charles Nordhaus, then 18 years old, and to several companions of the said Nordhaus, alcoholic liquors which caused the intoxication, in whole or in part, of the said Charles Nordhaus; that in consequence of said intoxication the said Nordhaus, early in the morning of February 8, 1941, drove a certain automobile into a private garage in Chicago where said automobile was regularly stored or kept, and omitted to shut off the ignition of said automobile, and in consequence of his said intoxication and as a result thereof died of carbon monoxide poisoning from the effects of the carbon monoxide gas that emanated from said automobile.

It is further averred in the amended complaint that Nordhaus was the son of the plaintiff and that his father was dead and had been for some time prior thereto; that said Nordhaus, prior to his death, was earning $17 per week, which he contributed to the maintenance and support of the plaintiff, and that by reason of his death and in consequence of his intoxication, plaintiff has been and is injured in her means of support and has sustained damages in the amount of $50,000 and is entitled to maintain this action pursuant to the applicable section of the Dram Shop Act.

The defendants answered severally. Newman admitted ownership of the premises and operation of a dram shop by Marek through his agent or servant, Wilkins. Marek admitted operation of the business through his employee Wilkins, but both defendants specifically denied all of the other allegations of said amended complaint, including the sale to Nordhaus, his subsequent intoxication and death as averred in said amended complaint.

It appears from the facts that on the early morning of February 8, 1941, the 18-year-old son of the plaintiff, Charles Nordhaus, came to his death as the result

of carbon monoxide gas poisoning in a garage at the rear of his home at 929 N. Keystone Ave., Chicago, Illinois. The exact time that the deceased died is not known, but he was last seen alive by the witness Norman Van De Car shortly after 2:00 a. m. February 8, 1941, when the latter saw him drive a car, a 1938 Packard eight coupe owned by his sister, into the alley at the rear of the Nordhaus home. The body of the deceased was discovered by the plaintiff at 10:00 a. m. February 8, 1941. The car had been backed into the garage by him and its front was facing the front of the garage, a customary procedure. The deceased was lying in the front seat, the head pointing toward the right door of the car and the feet extending out the left door which was open. Thereafter the body was taken to a mortuary where an autopsy was performed by the coroner's physician. A specimen of blood was taken and delivered to the coroner's chemist where it was analyzed by George Stoecker, chemist, on February 10, 1941. The chemical analysis showed 0.12 per cent grain alcohol by weight and 80 per cent saturation of carbon monoxide gas. The immediate death of Charles Nordhaus was caused by carbon monoxide poisoning.

The garage in question is located in the rear of the Nordhaus home and entrance thereto is obtained through a small service door near the northwest corner and large double doors on the east opening on to the alley. The alley is 16 feet wide, runs north and south and is constructed of concrete. The garage stores two cars and is approximately 20 feet square. The car entrances thereto are separated by a wood post and each entrance has double doors four feet wide. When the car was out of the garage the doors were kept closed and locked, and when the car was backed into 'the garage from the alley, the deceased was required to walk down two steps and along a cement walk to other steps leading to a small platform

and the service door. Footprints in the snow leading into the service door were discovered by the plaintiff. It appears from the evidence that it was easier to back the car into the garage and the car was usually driven therein in that manner. The deceased had often driven the car and was considered a good driver.

The car was equipped with a heater and a radio which was in good working condition. When the body was discovered the ignition to the car was turned on, the gas tank was dry and the battery was dead. Vomitus was found on the running board of the car, on the floor of the car, on the floor of the garage and outside of the garage off the apron in the alley.

Symptoms of carbon monoxide poisoning are headache, nausea, muscular weakness and violent vomiting. A person may die in three minutes from carbon monoxide poisoning; and, under the facts in this case, considering the size of the garage and the type of car, death would result in less than one-half hour. Death ensues from carbon monoxide poisoning where the saturation of carbon monoxide in the blood exceeds .55 per cent. The air of the garage was contaminated to the extent of about 7 per cent by the carbon monoxide thrown off by the exhaust of the automobile.

After the car was backed into the garage the doors were closed or almost completely closed, but not locked. The night of February 7th and the morning of February 8, 1941 was cold; there was snow on the ground, and the streets were slippery.

On February 7, 1941 the deceased left home alone at about 7:30 p. m. in this automobile and was in the company of Robert McNeilly between 12:00 midnight and 2:00 a. m. During part of that time, the deceased drove his car upon and along the slippery streets of Chicago in a careful manner. Between 12:00 midnight and 2:00 a. m. it is claimed the deceased had no alcoholic liquor to drink and did not appear to have been drinking; and it is claimed the deceased was jovial and

happy and gave no appearance of having had anything to drink. The deceased and Robert McNeilly, while together, went in the car to a restaurant at Crawford avenue and Lake street where they had a hamburger, french fried potatoes and coffee. They remained in the restaurant from one and one-half to two hours, after which they drove to a gas station at Augusta Boulevard and Crawford avenue where they saw Norman Van De Car, another friend of the deceased who subsequently saw the deceased drive his car into the alley where his garage was located.

The foregoing facts are undisputed except that plaintiff claimed to have seen her son at home between 1:30 and 2:00 a. m. that morning.

The evidence as to the sale of liquor to Charles Nordhaus on the night of February 7, 1941, and the evidence as to whether or not Charles Nordhaus was intoxicated that evening is in conflict. It appears that the evidence of the plaintiff and her witnesses Joseph Schwieger, Emily Scarnato and William Davie tended to prove that Nordhaus was in the Marek cocktail lounge between 9:30 and 11:00 p. m. February 7, 1941 and drank some alcoholic liquor there with them, whereas the evidence of the defendants' witnesses William Ganly, Ellen Ballinger, Dale Ballinger and Jean Wilkins tended to prove that Charles Nordhaus and his friends were not in the tavern at all that night. These witnesses for the defendants were corroborated very materially by defendants' witnesses James Barrota, Sid Sipin and Mariano DeGuzman who were members of an orchestra that supplied Hawaiian music at the tavern between the hours of 9:30 p. m. Friday, February 7th and 2:00 a. m. Saturday. This evidence concerning the orchestra music was important inasmuch as plaintiff's witnesses Joseph Schwieger, Emily Scarnato and William Davie testified that they danced by music from a juke box and that no Hawaiian orchestra played in the tavern while they were there.

On the question of intoxication of the deceased, the plaintiff's witness Joseph Schwieger testified that Charles Nordhaus was not intoxicated and neither Emily Scarnato nor William Davie gave an opinion on this question. The plaintiff's witness, Dr. S. S. Snider, testified in response to a hypothetical question that it was his opinion that 0.12 per cent of alcohol by weight in the blood would cause intoxication, but this doctor gave no reason for his opinion, whereas defendants' witnesses, Dr. William D. McNally, a toxicologist who had had years of experience in study and practice in this field, and Dr. George Rukstinat, a pathologist, testified that it was their opinion that 0.12 per cent alcohol by weight in the blood would not cause intoxication. The only lay witness who testified that the deceased was intoxicated was the plaintiff, mother of the deceased. She claimed to have been standing on the sidewalk in front of the tavern when the deceased came out of the door at 11:00 p. m. and then observed his condition, but none of the plaintiff's witnesses saw the plaintiff there, and plaintiff's witnesses William Davie and Joseph Schwieger testified that all of the boys left the tavern at the same time together. The plaintiff testified that she talked to her son, and further testified that she saw her son at home between 1:30 and 2:00 a. m. It is contended that this testimony conflicts with that of the disinterested witness, Robert McNeilly, who was in company with the deceased between midnight and 2:00 a. m.

It is contended by the defendants that the trial court erred in granting plaintiff's motion for a new trial and erred in not entering judgment upon the verdict, and they contend that while the motion for a new trial was addressed to the sound judgment of the trial court it has been said that no reversal will lie except in the case of clear abuse of discretion, which must be affirmatively shown, yet where the motion for a new trial is granted on alleged errors of law then only legal, as distinguished from discretionary, questions are in-

volved and the Appellate Court should grant leave to appeal as a matter of right to determine whether the trial court erred in granting a new trial on such legal grounds.

It appears from the trial court's opinion that he refused to grant a new trial on the ground that the verdict was against the manifest weight of the evidence, recognizing that it was a jury question to determine on which side lay the truth. The opinion of the court may be searched in vain to discover where any discretion was being exercised by him one way or the other, and it is urged that the case presented to the court purely legal grounds, namely, whether error had been committed in the presence of the Juror Newton upon the jury when her husband had been a reporter for a brief period during the trial, which fact was known to plaintiff's counsel throughout the trial, and alleged errors in refusing one of plaintiff's instructions and giving one of defendants', and that on these grounds the court granted plaintiff a new trial.

Defendants urge, however, in support of their petition for leave to appeal from the order of the trial court, that the alleged grounds raised pure questions of law; that a question of law cannot be said to call for an exercise of discretion, and that the Appellate Court should grant leave to appeal to determine whether the trial court erred in granting a new trial on such legal grounds, and cite in support of this theory the case of *Adamsen v. Magnelia*, 280 Ill. App. 418.

While it is true the trial judge is allowed a broad discretion in the granting of a new trial and that the motion is addressed to the sound judgment of the court, his action thereon will not be reversed except in case of clear abuse of such discretion, which must be affirmatively shown. (*Couch v. Southern Ry. Co.*, 294 Ill. App. 490, 492.) As to the rule that has been contended for where a new trial is granted for supposed errors of law and not based on discretionary grounds,

one of the cases that has been called to our attention is the case of *Wettaw v. Retail Hardware Mut. Fire Ins. Co.*, 285 Ill. App. 394, where the fourth district Appellate Court in rendering an opinion granted leave to appeal from an order of this kind and said: "Of course where a question is reasonably presented as to whether the court erred as a matter of law in so ruling, the right to review cannot be denied," citing the case of *Adamsen v. Magnelia*, 280 Ill. App. 418, and *Randall v. Randall*, 281 Ill. App. 169, which are cases decided by the Appellate Court of the second district. In the *Randall* case, Mr. Justice Dove said:

"The rule that the granting of a new trial is within the trial court's discretion, which will not be disturbed unless abused, applies only when the discretion is exercised on the facts, and the correctness of a ruling on a question of law will be determined on appeal, independently of the judgment of the trial court. 4 C. J. 833."

However, it is suggested by the defendants that only by the granting of appeals as a matter of course where only reasonable legal questions arise on the record, will this court give effect to the manifest provision of the statute which was designed to promote justice and to prevent a verdict warranted by the record and justified by the evidence, from being set aside and lost to the party who was fairly entitled thereto, such litigant being forced to undergo the hazard of another trial with its further incidence of delay and expense (*Lehman v. Hannah*, 307 Ill. App. 244; *Wettaw v. Retail Hardware Mut. Fire Ins. Co.*, 285 Ill. App. 394).

There is a question whether there was any irregularity in the presence of Juror Newton upon the jury, and whether it is waived by the plaintiff in the proceeding in the trial court after full knowledge of such irregularity. This matter as it is suggested arose upon the adjournment of court after the noon recess on the

second day of the trial, by counsel for plaintiff inquiring of the reporter if his wife was one of the jurors in the case. At that time the court did not deem the matter of consequence, and inquired if it made any difference. Mr. Thompson, counsel for the defendants, immediately offered to get another reporter, and stated that he knew nothing about it, that Mr. Walsh handled the reporting in the case. Mr. Thompson agreed with the court that it should be avoided, and then followed an inquiry by Mr. Soble of the reporter, bringing out that he was the husband of one of the jurors and the reporter for the defendants. This was in the presence but out of the hearing of the jury. Thereupon court and counsel retired to the chambers. In the chambers it developed that Mr. Newton was a free-lance reporter; that he was called by Mr. Walsh; that he had reported for him in another trial on the day before for the first time in six weeks. Thereupon Mr. Thompson stated he thought somebody else from Mr. Walsh's office should come over right away, and consented to a mistrial being declared if plaintiff's counsel desired one. Further inquiry of the reporter disclosed that he did not know his wife was on the jury, that it was just nothing more than a coincidence. Mr. Soble stated that he had no doubt that it was a coincidence, agreed with Mr. Thompson that he didn't know when they changed reporters and stated that it was quite embarrassing. The reporter stated that it was quite embarrassing for him, too. The court posed a question as to what would be the effect on Mrs. Newton if she learned that there was objection to Mr. Newton participating as a reporter. All parties discussed this and Mr. Newton expressed regret that he had not come over that morning and thereby avoided this trouble. The court suggested that counsel agree to excuse Mrs. Newton from jury service and try the case with eleven jurors. Mr. Thompson expressed disagreement with

this suggestion and stated that plaintiff's counsel could do whatever he wanted to do here, but that he wanted twelve jurors in the case and didn't think the matter prejudicial. Mr. Newton related a similar instance of a friend of his on a jury in another case at which he had been a reporter a couple of years before, as a result of which another reporter was procured.

The record shows that the reporter Newton had not reported any of the proceedings but that the matter was called to the court's attention by Mr. Soble just as the jury had stepped in the box with no evidence taken. Mr. Thompson, counsel for defendants, again stated that under the circumstances he thought they ought to get another reporter. The court stated that the juror observed her husband and tried to attract his attention but that he had his back turned to her. Thereupon, the court asked Mr. Soble, plaintiff's counsel, what he wanted to do about it. He stated to the court that he didn't know what to say; that the litigation had been very expensive; that he thought the best way out would have been to excuse the juror by agreement, but that he realized that he couldn't compel counsel to do this. He then stated that he "must take the chance that Mrs. Newton will do the fair and honorable thing and proceed with this trial." Mr. Thompson then stated that the reason he didn't want to discharge Mrs. Newton was the possible effect it might have on the other eleven jurors, that plaintiff's counsel should take advantage of his record here at the time, and that if he didn't, he waived the point; that he, Mr. Thompson, wanted the case tried by a fair and impartial jury. The court again suggested that Mrs. Newton be excused and Mr. Thompson expressed his apprehension, disclaiming any responsibility for Mr. Newton being present. Thereupon court and counsel left chambers and the trial proceeded for three and one-half days before this jury. Unfortunately, the record doesn't

show the fact that Mr. Newton was thereupon excused as a reporter and did not report any part of the trial after the discussion off the record with the court.

It is to be noted that no affidavits were filed in support of the motion for a new trial indicating that plaintiff was prejudiced in any way by this occurrence or that Juror Newton was in any way affected by it or in any manner endeavoring to influence the other eleven jurors. The error, as assigned in the motion for a new trial, requests the court to make an inquiry to determine whether the occurrence was inadvertent or intentional and that if it should appear that the occurrence was intentional, to grant a new trial. However, it appears, and it is suggested that this is a novel way of raising the question; and defendants submit that the question was raised by the assignment for the reason that it is not proper for a court to make an investigation of a case, or any matter pertaining thereto, outside of the presence of counsel for both parties, and for the further reason that no affidavits were filed in support of the point indicating that any prejudice ensued.

The trial court, in his opinion, granting the motion for a new trial, drew inferences clearly not appearing from facts of record, namely, that the juror knew that the reporter was reporting the case for the defendants, that someone had suggested to Walsh to bring Newton in to report the case, and that outside influence or contamination of the whole jury resulted therefrom. Nowhere in this record, by affidavit or otherwise, does it appear that Mrs. Newton knew for whom her husband was reporting or that Mr. Walsh procured Newton to report the case for the defendants because of the presence of his wife on the jury.

The suggestion is offered that a party who assumes the burden of alleging prejudice should bring before the court by affidavit or otherwise facts to sustain his position.

The right of parties litigant to a fair and impartial trial by a fair and impartial jury is entirely lost if the verdict can be set aside on matters which do not appear of record to be true or which lie in the imagination or apprehension of court or counsel.

The plaintiff contended that the trial court erred in giving certain instructions at defendants' request and in refusing to give certain instructions at plaintiff's request, and called attention to instruction number 20 which was given at defendants' request, which plaintiff alleges was bad, and being a mandatory instruction that this alone was sufficient to warrant a new trial. The instruction that is complained of defines "proximate cause" as "that cause which in a natural and continuous sequence, unbroken by any other cause, produced the event," and plaintiff alleges thereby committed the error which plaintiff feared. It is further suggested by the plaintiff that as it is undisputed that the direct cause of decedent's death was carbon monoxide poisoning, that cause came squarely within the meaning of "any other cause," and that this instruction therefore stated very plainly to the jury that before the intoxication could be said to be the proximate cause of the death, it had to be "unbroken by any other cause," *viz.*, carbon monoxide poisoning; that it did not say "a new and independent" cause, or an "intervening efficient" cause, but "any other" cause, and that under this instruction plaintiff could not possibly secure a verdict.

The defendants, however, in answer to the contention of the plaintiff contend that there was no error committed in giving defendants' instruction number 20; that although plaintiff refers to instruction number 20 as a mandatory instruction this is hardly an accurate statement, as the portion of it objected to is in no sense mandatory and is ordinarily given as a separate instruction defining proximate cause. It is urged that no attempt is made by plaintiff to answer

the case of *Fippinger v. Glos,* 190 Ill. App. 238, 239, to the effect that the jury would be more likely to understand the words "proximate cause" than they would the words "efficient cause," and further replying to plaintiff's contention defendants point to the fact that plaintiff suggests that the instruction should have contained the words "intervening efficient cause." Also defendants point out that no reply is made to *Berry v. Breed,* 311 Ill. App. 469, 480, to the effect that the words "so that" were used "as the equivalent of proximate cause and any layman would so understand them." There is a suggestion that is offered that the two cases quoted answer plaintiff's argument that "any other cause" would preclude plaintiff from recovering a verdict, particularly when plaintiff's instruction number 12 is considered, which specifically advised the jury that if they believed from the evidence that "in consequence of said intoxication . . . deceased drove the automobile . . . into the garage and omitted to shut off the ignition . . . and that by reason of such omission . . . the deceased died of carbon monoxide poisoning, then you may find that the said intoxication proximately caused the death of said deceased."

Defendants further aver in answer to plaintiff's statement that defendant claimed that any error in number 20 was obviated by number 12, that the defendants did not concede that number 20 was erroneous, and that instead they cited *Fippinger v. Glos,* 190 Ill. App. 238, 239, and *Berry v. Breed,* 311 Ill. App. 469, to support the premise that the instruction was not error, as well as *Reivitz v. Chicago Rapid Transit Co.,* 327 Ill. 207, 213, and *Bobalek v. Atlass,* 315 Ill. App. 514, 525, 526, which authorities hold that the test is how the average juror would understand the instruction; and that it is to be observed that in the cases cited by plaintiff the instructions were clearly and palpably erroneous.

Plaintiff urges that the case of *Hanson v. Trust Co. of Chicago,* 380 Ill. 194, has a bearing on the question involving defendants' instruction number 20. In the opinion of the court in the *Hanson* case it is said:

"When a peremptory instruction omits a fact or circumstance essential to recovery, the law is that such error in the instruction cannot be cured by any other instruction in the series of instructions."

As we have indicated in this opinion, it does not appear that the instruction number 20 does omit a fact or circumstance essential to recovery. It seems apparent from the *Hanson* authority that the plaintiff in the present case received from the jury more liberal consideration than the law allows, and, further, that the plaintiff's given instruction number 12 was broad in that it instructs the jury "if you believe from the evidence," whereas it should have been "if you believe from a preponderance of the evidence." From the *Hanson* case we do not reach the conclusion that instruction number 20 is subject to the criticism that would make this instruction obnoxious to the extent that it was erroneous, or that the court erred in giving the instruction as it is in this record.

Plaintiff argues that the giving of instructions number 19 and number 30 in addition to number 20 was error because it placed undue emphasis on the propositions which plaintiff was required to prove. In reply, *Rasmussen v. Wiley,* 312 Ill. App. 404, 407 and *City of Lake Forest v. Janowitz,* 295 Ill. App. 289, 295, were cited by defendants.

When we come to consider the question as to the undue emphasis which plaintiff alleged was placed upon the propositions she was required to prove, we do not find that the instructions indicated undue emphasis as to the propositions which plaintiff was required to prove to comply with the rule as to the giving of in-

structions that should aid the jury in reaching a conclusion that would justify the verdict.

There were other objections offered to the instructions that were given by the court and we have carefully considered them, but we do not find any reason advanced that would justify our reaching the conclusion that the court was in error and therefore on account of such error that the court was justified in granting the plaintiff a new trial.

There is also complaint made of instruction number 3, and error is assigned on the refusal to give this instruction, plaintiff pointing out that this instruction was included in the instructions given in the case of *North Chicago St. R. Co. v. Wellner*, 206 Ill. 272. However, defendant points out that the only objection urged to the instruction in that case was to the use of the words ''their apparent intelligence or lack of intelligence,'' and says the case cited is no precedent in this case, as the question of ignoring the greater number of witnesses was not raised in the cited case, that it should have been incorporated, and the instruction number 3 not being complete the court did not err in refusing to give the instruction.

The plaintiff further objects to certain hypothetical questions. The ultimate fact which the jury had to decide was whether intoxication was the effective cause of death. On this point defendant cites the case of *Baker & Reddick v. Summers*, 201 Ill. 52. The questions objected to referred only to the question of the decedent's intoxication. It is elemental that any witness can express an opinion as to whether a person was or was not intoxicated. Obviously if a lay witness can testify as to whether a person was or was not intoxicated, testimony thereof by an expert upon an assumed state of facts does not invade the province of the jury, which is the objection made to the question by plaintiff. Plaintiff has cited the case of *Fellows-Kimbrough v. Chicago City Ry. Co.*, 272 Ill. 71, and *Phillips v. Brown*,

285 Ill. App. 443, but in those cases the question called for a conclusion of ultimate fact, and obviously that is not the situation here. No question was asked the witness as to whether the deceased died as the result of being intoxicated, and the question referred only to whether the deceased was or was not intoxicated, leaving to the jury the ultimate fact as to whether his death resulted therefrom.

A further question that is complained of is with reference to the refusal to permit Dr. McNally's book to go to the jury, and it appears from the record that the jury heard the so-called impeaching portions of the book in question, and it would be no different from permitting the jury to take with them into the jury room a signed statement which impeached a witness. Under the statute, as it is contended for, such a document is not a paper read in evidence which may be carried from the bar by the jury. In support of this position defendant cites *Nelson v. Northwestern El. R. Co.*, 170 Ill. App. 119 and *Johnson v. N. K. Fairbank Co.*, 156 Ill. App. 381.

So that after having considered all the questions that we believe pertinent to be considered, and having reached the conclusion as we have pointed out, we are of the opinion that the order granting plaintiff a new trial be reversed, and the cause remanded with directions that the court overrule said motion for new trial and enter judgment on the verdict.

*Reversed and remanded with directions.*

BURKE, P. J., and KILEY, J., concur.