THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ANTHONY PARSON, Defendant-Appellant.

(No. 74-263;

Fifth District—November 20, 1975.

Paul Bradley and Gordon Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

Robert H. Rice, State's Attorney, of Belleville (Bruce D. Irish and Raymond F. Buckley, Jr., both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. PRESIDING JUSTICE JONES delivered the opinion of the court:

Anthony Parson, James Bizzle, and Marcus Franklin were charged by a five-count indictment with the murders of Joseph Nodiff and Wilbur Greer, the attempt murder of Melvin Lewis, the armed robbery of $150 from Joseph Nodiff, and the armed robbery of a .38-caliber gun from Edward Houston. Parson and Bizzle were tried together before a jury in March 1973. After the State had presented its evidence, the attorney for Parson and the attorney for Bizzle moved for directed verdicts on all five counts. The motions were allowed with respect to the attempt

murder but denied with respect to all other counts. The jury returned verdicts of not guilty with respect to both defendants on the count of armed robbery of Joseph Nodiff and guilty verdicts with respect to both defendants on the remaining three counts. However, a mistrial was declared when one of the jurors refused to affirm the verdicts upon the polling of the jury.

Parson, hereinafter referred to as defendant, was brought to trial individually in February 1974, again before a jury. He was tried for the murders of Nodiff and Greer and the armed robbery of the gun from Houston. Prior to this second trial it was determined that the jury in the original trial had affirmed the not guilty verdict as to the armed robbery of Nodiff.

The second trial resulted in jury verdicts of not guilty with respect to the murders of Nodiff and Greer and of guilty with respect to the armed robbery of Houston. Judgment was entered upon the verdict and the defendant was sentenced to 30 to 90 years. From the judgment on the guilty verdict and the sentence defendant brings this appeal. Defendant raises four issues: (1) whether the State proved the defendant guilty beyond a reasonable doubt; (2) whether reversible error occurred when the jury was allowed to view a photograph which the trial court later ruled inadmissible; (3) whether reversible error occurred in allowing the State to prove the date of a prior armed robbery of which the defendant had been convicted; and (4) whether the sentence was excessive.

This case arose out of the armed robbery of the Ohio Market in East St. Louis, Illinois, by three men on May 29, 1971. The Ohio Market is a neighborhood grocery store which at the time of the robbery was owned by Joseph Nodiff. During the course of the robbery $150 was taken from the person or presence of Nodiff and a pistol was taken from the person of Edward Houston, a store employee. Also during the course of the robbery Wilbur Greer, a customer, was shot one or more times in the chest and Nodiff was shot once through the head. Nodiff died immediately. Greer died eleven days later from pneumonia which had directly resulted from the wound in his chest.

Defendant's first contention on this appeal is that the State failed to prove him guilty beyond a reasonable doubt of the armed robbery of the .38-caliber pistol from Edward Houston. Defendant bases this contention on his assertions that the eyewitnesses viewed the robber only fleetingly and that the jury returned inconsistent verdicts in finding defendant not guilty of the murders but guilty of the armed robbery of the pistol.

There were three eyewitnesses to the crimes committed at the Ohio

Market on May 29, 1971, who testified at the second trial of the defendant. Melvin Lewis and Edward Houston, employees of the store, and Janie Pegues, a customer, each positively identified the defendant at the trial as a participant in the crimes. Lewis testified that he was a meat cutter and on the morning of May 29, 1971, was working behind the meat counter in the rear of the store. He noticed two strangers come into the store and up one of the aisles to the meat counter. Both of the men had on matching denim pants and jackets. One of the two men, whom Lewis later identified as the defendant, ordered some baloney. As Lewis was slicing the meat, he kept looking back at the two men. One of the two men kept looking toward the rear entrance of the store. A third man dressed in a matching denim outfit then came in the rear door and ordered Lewis to get down on the floor. Lewis noticed that this third man was armed. The other two men went away from the meat counter toward the front of the store and Lewis was not able to see them again.

Houston testified that as he was working in an aisle of the store he heard the recoil of an automatic weapon behind him. He turned to the source of the sound and a man whom Houston identified as the defendant announced a holdup and told Houston to turn around. Before Houston complied with the command he was able to observe the weapon, the defendant's clothing, and the defendant's face, which was not concealed in any way.

Janie Pegues testified that as she entered the front of the store a man announced to her that a holdup was taking place. She asked the man what he had said, and he repeated that it was a holdup and told her to go to the rear of the store and lie on the floor. The man had on a blue jean outfit and black gloves and had a gun in his hand. Mrs. Pegues later identified this man as the defendant. Mrs. Pegues went to the rear of the store; she did not lie down, however, but instead stood facing the front of the store and observed the man who had announced the holdup to her standing near the front doors.

■■ The record clearly demonstrates that defendant was positively identified by three witnesses as a participant in the criminal activity which took place at the Ohio Market. The testimony of these three witnesses belies any assertion that they were able to view the defendant only fleetingly.

■■ The thrust of the second part of the reasonable doubt argument made by defendant is that, if defendant was sufficiently identified as a participant in the crimes, it was inconsistent to convict him of the armed robbery of Houston's pistol while not convicting him of the murders of Nodiff and Greer. Although it is not clear that a reversal of this case would be required if we in fact found the verdicts to be

inconsistent (see *People v. Hairston,* 46 Ill.2d 348, 263 N.E.2d 840; *People v. Dawson,* 60 Ill.2d 278, 326 N.E.2d 755), we find it unnecessary to discuss that point, for under the circumstances of this case there was no inconsistency in the verdicts.

As stated previously, defendant's second trial was for three offenses—the murder of Joseph Nodiff, the murder of Wilbur Greer, and the armed robbery of a pistol from Edward Houston. Among the jury instructions given were IPI 7.01, 7.02, 14.01, and 14.02. These instructions were given in full, with no modification other than the insertion of the names of the victims and the term "armed robbery" where appropriate. No instruction on the law of accountability was given, however. IPI 7.02 says in part:

> "To sustain the charge of murder, the State must prove the following propositions:
>
> *First:* That the defendant performed the acts which caused the death of _____;
>
>    *   *   *
>
> If, on the other hand, you find from your consideration of all the evidence that any of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty."

Thus, without an accountability instruction, the jury was told by IPI 7.02 to find the defendant not guilty of murder unless the proof showed beyond a reasonable doubt that *he* performed the acts which caused the death of either Greer or Nodiff. Similarly, the jury was told by IPI 14.02 to find the defendant not guilty of the armed robbery of Houston unless the proof showed beyond a reasonable doubt that the *defendant,* rather than one of the other robbers, took the pistol from Houston. In other words, the instructions told the jury that it could not find the defendant guilty of any crimes which were not the result of the direct acts of the defendant.

Our review of the record of defendant's second trial shows that the evidence fell far short of establishing who actually shot Greer and Nodiff. It is not necessary that we discuss this evidence other than pointing out that none of the eyewitnesses actually saw the shooting. They could only describe hearing footsteps, scuffling, and gunshots in the area where the victims were later found. On the other hand, the evidence that the defendant was the robber who actually took the pistol from Houston is sufficient to meet the standard of proof beyond a reasonable doubt.

Of the three occurrence witnesses who testified concerning the crimes committed at the Ohio Market, only Houston described the taking of

the pistol from his person. Neither Melvin Lewis nor Janie Pegues was questioned concerning this incident during their testimony. Houston's testimony on its face is confusing in that Houston at some times appeared to be describing the defendant while at other times he appeared to be describing one of the other robbers as the one who took the pistol. Houston at one point described being searched without the pistol being taken and later described the pistol being grabbed from his holster. He also continuously referred to "the man that was behind me" or "the fellow behind me," even though Houston changed positions several times during the robbery which resulted in a different robber being behind him at different times.

However, three factors make it clear that Houston was describing the defendant as the one who took the pistol. The first is the fact that the defendant was the only one of the three robbers whom Houston ever described as carrying a gun. The second is the fact that the defendant was the robber who originally came up behind Houston, and that, as a consequence, Houston continuously referred to the defendant as the man behind him. The third is our reference to People's Exhibit No. 1, which is contained in the record on appeal. (People's Exhibit No. 1 is a diagram of the inside of the Ohio Market, which Houston used to illustrate to the jury the location of the things and events he described.)

In light of these three factors, Houston's testimony on direct examination, as pertinent to the taking of his pistol, can be summarized as follows. Houston heard the weapon recoil, turned, and saw the defendant. The defendant announced the store robbery to Houston and told him to turn around. Houston then turned around and saw a man (whom we can refer to as the second robber) near "check-out counter number one" and a "seed rack." The second robber told Houston to get on the floor, which Houston did. As Houston was lying on the floor the second robber came over and began to search him. Before the second robber completed the search, however, some scuffling and gunshots were heard in another part of the store. When the second robber heard the scuffling and gunshots, he stood up without having completed the search and without having found the pistol, which Houston had in a holster on his left side under his apron. The defendant then came to Houston and told him to get up, but the second robber told Houston to stay down. Since the defendant was the one with the weapon, Houston stood up. The defendant told Houston to put his hands on his head. Houston did this and began walking toward the rear of the store. (It is not clear from the testimony why Houston began walking to the rear of the store. Apparently, the defendant wanted to get Houston into the meat cooler and

told Houston to walk there.) When Houston reached a point halfway down the aisle, the defendant stopped him because the defendant became aware of the pistol under Houston's apron. He made a statement such as "I thought you didn't have a gun," snatched the gun from Houston's belt, and pushed him into the cooler.

On cross-examination, Houston admitted that he really did not know with absolute certainty which of the robbers had actually taken the pistol from him, because it was snatched from behind. However, he stated that to the best of his knowledge it was the defendant who took the pistol. He explained that this belief was based on his recognition of the defendant's voice, the fact that the defendant had been the one who had told him to get up, and the fact that when he got up the second robber was in another location of the store (near the "seed rack"), whereas the defendant stood face to face with him. At no point throughout his testimony did Houston express any knowledge of a third participant in the crimes.

■■ The ability of Houston to determine that the defendant was the robber who actually took the gun was a matter for the jury to decide in assessing the credibility of Houston's testimony. (*People v. German,* 22 Ill.App.3d 389, 317 N.E.2d 113.) The general rule being that the sufficiency of eyewitness identification is a matter for determination by the trier of fact, a reversal will not be warranted unless the testimony is so unsatisfactory as to leave a reasonable doubt as to the guilt of the accused. (*People v. Rogers,* 23 Ill.App.3d 115, 318 N.E.2d 715.) We believe that the testimony was sufficient to prove beyond a reasonable doubt that it was the defendant who actually took the gun. It therefore was not necessary for the jury to resort to an accountability theory to determine the defendant guilty of taking the pistol from Houston. Considering the instructions given in this case and the absence of any instruction on the law of accountability, the jury must have believed that it could convict the defendant only for those crimes which directly resulted from his acts. In light of the evidence and instructions in this case, the jury's determination that the defendant was guilty of the robbery of Houston but not guilty of the murders of Nodiff and Greer is entirely consistent. There was no evidence directly linking the defendant to the shooting of Nodiff and Greer; there was sufficient evidence linking the defendant to the taking of the pistol from Houston.

Defendant next contends that the trial court committed reversible error in permitting the State's Attorney to pass a gruesome photograph to the jury, which the court, after initially deferring its ruling on admissibility, later determined to be inadmissible. We are of the opinion

that this issue is not properly before this court. Our review of the record indicates that it is not in the least clear that the objected-to photograph was ever passed to the jury.

At the defendant's second trial the State sought to introduce ten exhibits. Exhibit No. 1, as previously discussed, was a diagram of the inside of the Ohio Market. The remaining nine exhibits were photographs. Exhibits No. 2 through 8 were photographs of the store, taken from various positions. Exhibit No. 9 was a photograph of Joseph Nodiff taken shortly after he had been shot and killed. It showed him in a slumped position, with a bullet hole in his forehead and blood dripping from his mouth onto his hand. Exhibit No. 10 was a photograph of defendant taken by the St. Louis Police Department. Of these exhibits, the diagram of the store (No. 1), six of the photos of the store (Nos. 2 through 7) and the photo of defendant (No. 10) were admitted either when offered or later after argument by both counsel. It is unclear whether the seventh photo of the store (No. 8) was ever admitted. The photo of Nodiff (No. 9) was ruled inadmissible after argument.

Defendant's assertion that the State's Attorney passed Exhibit No. 9 to the jury is based solely on the following discussion which occurred on the first day of defendant's second trial:

"Q. [STATE'S ATTORNEY]: If the Court please, I'll offer into evidence People's Exhibits 1 through 9.

THE COURT: 4 and 5 have already been admitted.

[STATE'S ATTORNEY]: Yes. 1 through 3 and 6 through 9.

[DEFENSE COUNSEL]: No objection to People's Exhibit #2. No objection to People's Exhibit #3. No objection to People's Exhibit #6 or 7. Your Honor, I would object to People's Exhibit #9.

THE COURT: Gentlemen, approach the bench."

(At this time, a discussion was had at the bench between court and counsel and off the record.)

"THE COURT: Mr. Hoffman, you can make your objections for the record when we recess for the day.

[STATE'S ATTORNEY]: Your Honor, I would ask leave at this time to distribute these photographs among the jury. I'll start three in the first row and three in the second row to save time.

THE COURT: Ladies and gentlemen, you'll have those photographs later, so you don't have to study them in detail. You can just look at them and pass them along."

This portion of the record indicates that the State's Attorney circulated six photographs among the jurors. Which of the eight photographs which the State's Attorney had sought to have introduced at

this point were actually circulated is a matter of speculation. It is logical to assume that the photographs circulated were the six which had been admitted at that point, namely, Nos. 2, 3, 4, 5, 6, and 7. However, such assumption or speculation on our part is not required, for alleged misconduct of opposing counsel must be apparent in the record before it can be considered on appeal.

"The right of parties litigant to a fair and impartial trial by a fair and impartial jury is entirely lost if the verdict can be set aside on matters which do not appear of record to be true or which lie in the imagination or apprehension of court or counsel." (*Nordhaus v. Marek*, 317 Ill.App. 351, 363, 45 N.E.2d 993, 998.) "Where error is predicated on alleged misconduct of opposing counsel, such as an improper approach to the jury, exhibiting to the jury items not in evidence, or an assertedly improper argument to the jury, * * * it is requisite that the record show, by proper bill of exceptions or otherwise, that the conduct complained of occurred." (4 Am.Jur.2d *Appeal and Error* § 541, at 972-73 (1962).)

Additionally, see *Springer v. Yellow Cab Co.*, 328 Ill.App. 354, 65 N.E.2d 482 (abstract opinion); *Rumsey v. Spratt* (1927), 79 Mont. 158, 255 P. 5, 7; *People v. Agnew* (1940), 16 Cal.2d 655, 107 P.2d 601, 603; 4A C.J.S. *Appeal and Error* § 1206, at 1333-34, and § 1211, at 1343-46 (1957); and Annot., 46 A.L.R.2d 1423, 1426, § 2(a) (1956).

The third contention made by defendant is that the court erred in allowing the State's Attorney to show that defendant committed an armed robbery on April 21, 1971 (approximately one month before the armed robbery at the Ohio Market). The circumstances of the State's Attorney's showing the date of the commission of the prior armed robbery compel us to conclude that no error was committed in this regard.

Defendant testified in his own behalf at his second trial. As an alibi defense defendant testified on direct examination that he had left the St. Louis metropolitan area on April 30, 1971, for Battle Creek, Michigan. He stated that his purpose in going to Battle Creek, Michigan was to seek employment and that he did not return to the St. Louis area until about a month later (after May 29, 1971). Also on direct examination, the following colloquy occurred between defense counsel and defendant:

"Q. Now, Anthony, have you ever been convicted of an armed robbery?

A. Yes, I have, sir.

Q. Are you presently serving time on that armed robbery?

A. Yes, I am, sir.

Q. When were you arrested?

A. June 4th, '71.

Q. That's shortly after you returned, right?

A. Yes, it was."

On cross-examination of the defendant, the State's Attorney, after initially questioning the defendant on some matters not here relevant, requested a conference out of the presence of the jury to discuss the next matter he wished to pursue. The jury was removed from the courtroom and a lengthy discussion took place regarding the method of impeachment of defendant which the State's Attorney wished to undertake. The State's Attorney pointed out that the defendant actually had four convictions for "the crime of robbery in the first degree by means of a dangerous and deadly weapon, as defined by Missouri law." He also pointed out that all four of those robberies had been committed within a short time before or after the Ohio Market robbery and that he wished to bring out the dates of two of the robberies, one of which was committed April 21, 1971, and the other June 4, 1971. He stated that his purpose in bringing out these dates was to attack the credibility of defendant in a number of ways, namely by casting doubt on whether defendant had actually gone to Battle Creek, by casting doubt on defendant's statement concerning the length of time he had remained in Battle Creek, and by showing that defendant's motive in going to Battle Creek was to escape capture rather than to seek employment.

After a lengthy discussion of this matter, including consideration of whether the State's Attorney should be allowed to bring out all of the convictions, two of the convictions, none of the convictions, the date of the robbery committed after the instant offense, or the dates of the robberies committed prior to the instant offense, the court ruled that only the April 21, 1971, date could be shown. The court stated that the April 21, 1971, date was allowed to be shown "for the purpose of impeaching the reason why [defendant] left the [St. Louis] area." Defense counsel, in the presence of defendant, agreed to this ruling.

The jury thereafter returned to the courtroom and cross-examination of defendant continued. During this cross-examination, the following colloquy occurred:

"Q. Anthony, you have mentioned that you stand convicted of a crime of armed robbery, is that right?

A. Yes, sir.

Q. And was that out of the Circuit Court of the City of St. Louis?

A. Yes, it was, sir.

Q. And did that occur in 1971, the conviction?

A. Yes, it did, sir.

Q. Now is it true, Anthony, that the date of that armed robbery for which you were convicted in St. Louis—

A. Yes, sir.

Q. Was April 21 of 1971?

A. Of the robbery?

Q. Yes, sir.

A. Yes, it was.

Q. Now, isn't it also true, Anthony, that the reason you left for Battle Creek, Michigan on the 29th of April was because you were wanted for an armed robbery in St. Louis?

A. No, sir."

The cross-examination ended at that point. There was no objection to the question concerning the robbery committed on April 21, 1971.

Defendant now argues that the only purpose which the State's Attorney could have had in introducing the date of April 21, 1971, was to show that defendant had a propensity for committing armed robberies. Defendant asserts that the motive for his going to Battle Creek was irrelevant and should not have been shown, citing *People v. Pfanschmidt*, 262 Ill. 411, 104 N.E. 804.

■■ Even if we were to assume that the court should not have allowed the State's Attorney to show the date of one of defendant's prior robberies, we must conclude that defendant has waived any consideration of this matter on appeal. Defendant not only failed to object to the question concerning the April 21 robbery (see *People v. Trefonas*, 9 Ill.2d 92, 136 N.E.2d 817), but, more importantly, defendant agreed to having the date shown in order to prevent three other robbery convictions from being shown. That is, defendant as a matter of trial strategy waived his objection to the showing of the date.

"Where parties, even in a criminal case, knowingly and deliberately turn down a course of procedure which at the time appears to be to their best interest, they cannot be permitted at a later time after a decision has been rendered adverse to them, to obtain a retrial according to the procedure which they had voluntarily discarded and waived." *United States v. Cook*, 432 F.2d 1093, 1101-1102 (7th Cir. 1970), *cert. denied*, 401 U.S. 996, 28 L.Ed.2d 535, 91 S.Ct. 1224.

■■ Defendant's last contention is that the 30- to 90-year sentence is excessive. Armed robbery is a Class 1 felony. (Ill. Rev. Stat., ch. 38, § 18—2(b).) The maximum term of imprisonment for a Class 1 felony can be any term in excess of 4 years, and the minimum term shall be 4 years unless the court, having regard to the nature and circumstances of the offense and the history and character of the defendant, sets a higher

minimum term. (Ill. Rev. Stat., ch. 38, § 1005—8—1(b)(2), (c)(2).) In imposing sentence the court stated that it was taking into account the fact that two men had been killed during the course of the robbery at the Ohio Market, the fact that the defendant now had five armed robbery convictions, and the fact that the defendant (who was 22 years old) had virtually no employment history.

We find no abuse of discretion in the sentence imposed and, therefore, will not disturb that sentence on this appeal. See *People v. Taylor*, 33 Ill.2d 417, 211 N.E.2d 673.

The judgment is in all respects affirmed.

Affirmed.

EBERSPACHER and CARTER, JJ., concur.