No. 1166. Cook *v.* United States. C. A. 7th Cir. Certiorari denied.

Mr. Justice Douglas, with whom Mr. Justice Brennan concurs, dissenting.

I would grant the petition on the issue of electronic surveillance.

In this criminal prosecution counsel for the defense asked if the Government had obtained any evidence by means of listening devices or electronic eavesdropping.[1] The prosecutor would say only that "no illegal eavesdropping devices were used."[2] He would not state whether any eavesdropping equipment had been used.[3] The trial judge refused to order the disclosure.[4]

On appeal, petitioner contended that the Government must disclose whether there had been electronic surveillance, regardless of its views on the legality. The legality

---

[1] Defense counsel gave as his reason: "For example, on cross examination there was some question about a conversation, a phone conversation that the defendant had."

[2] "[W]e are not going to make it a practice in our office to show the Court during each trial what eavesdropping devices we used, because on its face it might be illegal."

"I don't think that we have to commit ourselves in any case and say, 'Judge, since it might be illegal, we did not use it,' so that we can make a record."

[3] "I represent only to your Honor in this case, and we will in other cases, that there was nothing illegal about any of the evidence we presented, no illegal eavesdropping devices were used, and I don't think that I have to tell defense counsel whether or not we used eavesdropping equipment."

[4] "[T]hey have sort of a practice that the one who is honored to reveal these things has been left to the Solicitor General of the United States. I know of no district attorney that has made a disclosure yet. They either make it in the Supreme Court or they make it in the Seventh Circuit, but we haven't got down to the lower echelon yet where that has been disclosed even by the Solicitor General."

of such surveillance was for the court to determine, he argued, and he asked for a hearing to determine if such devices were used.[5] The Government asserted on appeal that "there was no electronic surveillance involved in this case." This statement was supported by a letter from the Department of Justice:

"Please be informed we have contacted the appropriate investigative agencies and have been informed Cook was *not* the subject of a direct microphone surveillance nor were any of his conversations monitored. Further, we are informed, no electronic surveillance was maintained on premises which were known to have been owned, leased, or licensed by the above individual."

Petitioner contended that this letter was far from clear as it did not state which agencies were contacted and only stated that he was not the subject of "direct" microphone surveillance, suggesting "indirect" surveillance. The Court of Appeals agreed that the statement of the prosecutor was "not unequivocal," 432 F. 2d 1093, 1109, and that the disclosure should have been made to the trial judge. Yet it affirmed the conviction without further inquiry.

Petitioner contends that he is entitled to a judicial determination of the existence and legality of electronic eavesdropping. He argues that the United States has never stated unequivocally that no electronic eavesdropping occurred. The Solicitor General relies on the letter which I have quoted. Moreover, he indicates that the

---

[5] "While defendant takes the position that disclosure in open court is the constitutionally preferred procedure, he submits at the same time that an *in camera* determination of legality or illegality was required as an absolute constitutional minimum under the Fourth Amendment." (Brief for Defendant-Appellant in CA7, pp. 62–63.)

procedure followed below is in accordance with "statutory procedures now provided with respect to claims of illegal electronic surveillance in proceedings occurring after October 15, 1970 . . . ." From now on, the United States will not even review its files to determine the existence of evidence stemming from electronic surveillance unless the defendant meets the "burden of raising any issue of illegal electronic surveillance . . . ."

The Omnibus Crime Control and Safe Streets Act of 1968, § 802, 82 Stat. 212, 18 U. S. C. §§ 2510–2520 (1964 ed., Supp. V), provides for electronic surveillance either on warrants issued by a magistrate, § 2516, or on the sole initiative of the designee of the Attorney General who "reasonably determines" that there is "an emergency situation" respecting "conspiratorial activities" which threaten the national security or which involve "organized crime." § 2518 (7). The officer must apply for an order approving the interception within 48 hours, complying with procedures for obtaining an order of authorization. If the application is denied, or approval is not issued before the interception is terminated, the contents of any intercepted communication are to be treated as illegally obtained. § 2518 (7).

The Act sanctions free use of intercepted information among investigative personnel, § 2517 (1). It also widely protects "evidence derived therefrom," §§ 2517 (1), (2), and (3), including the giving of testimonial evidence.[6] But any person whose "wire or oral communication is intercepted, disclosed, or used" in violation of the ways I have enumerated has suit for actual and punitive damages and reasonable attorneys' fees and costs. § 2520.

---

[6] There is the initial question whether any intercepted communications relating to the offense of which petitioner was convicted are evidence of "offenses other than those specified in the order of authorization or approval," § 2517 (5). If so, "[s]uch contents and any evidence derived therefrom may be used [as testimony at trial]

The issue of "illegality" raised by the Government's defense would raise a myriad of questions depending on the facts. They would pertain to the question of whether the showing required by § 2518 (1) of the Act had been made to the magistrate and raise the basic question whether, if a magistrate issued a warrant, there was "probable cause," § 2518 (3). If there were a warrant, the question would also be whether the "search" was confined to the person, place, and time which were authorized. §§ 2518 (4), (5). If there were no warrant but only the action of the Attorney General under § 2518 (7), a host of different questions would be raised on the issue of "illegality."

These are new questions not yet decided under the new Act. They are important questions involving high matters of policy. They will affect many cases. It is appropriate that we reach the questions here and now, so that the procedures to be used in protecting the rights of the citizen and confining the prosecution within constitutional bounds be resolved.

While *Alderman* v. *United States,* 394 U. S. 165, was pending here, it was revealed that the United States had engaged in wiretapping which may have violated the Fourth Amendment and tainted the convictions of petitioner. We had earlier refused to accept "the ex parte determination" of the issues by the Department of Justice, *Kolod* v. *United States,* 390 U. S. 136, 137, and in *Alderman* worked out the procedures whereby the District Court would determine whether the evidence obtained was "the product of illegal surveillance." 394 U. S., at 168. The questions in that case concerned the

when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter." This would seem to place upon the Government the burden of knowing the source of its evidence, even without challenge from a defendant.

use of "evidence originating in electronic surveillance violative of his own Fourth Amendment right to be free of unreasonable searches and seizures." *Id.*, at 176. That is the question here and it is obviously not controlled by administrative practice or the Omnibus Crime Control and Safe Streets Act, both of which are subordinate to the Constitution.

The procedure to be designed here is not relevant only to criminals.

Electronic surveillance is today common and pervasive, as we know from reports filed pursuant to § 2519 (3) of the Act [7] and from various Senate and House investiga-

---

[7] The number of reported interceptions of communications made pursuant to the Act indicates the problem is not small. In the last six months of 1968 there were 174 authorizations issued, all to state officers. One hundred forty-seven devices were installed. The average period of time authorized was 20 days. There were 128 extensions, averaging 20 days. Approximately 4,312 persons were involved in 66,716 intercepted communications. One hundred twenty-six intercepts were in dwellings and 45 were in business establishments. Based on Report on Applications for Orders Authorizing or Approving the Interception of Wire or Oral Communications for the Period June 20, 1968, to December 31, 1968, Administrative Office of the United States Courts.

In 1969, the pace did not perceptibly diminish.

| | Total | Federal | State |
|---|---|---|---|
| Number of applications...... | 304 | 34 | 270 |
| Authorizations issued........ | 302 | 33 | 269 |
| Average length of Authorization ............. | 26 days | 16 days | — |
| Extensions granted .......... | 194 | 11 | 183 |
| Average length of extension.. | 22 days | 14 days | — |
| Total period authorized...... | 9,019 days | 462 days | 8,557 days |
| Number of devices installed.. | 271 | 30 | 241 |
| Telephone wiretap......... | 250 | 27 | 223 |
| Listening device........... | 15 | 1 | 14 |
| Both ..................... | 6 | 2 | 4 |

tions, including the one being conducted by Senator Ervin.[8] These invasions of privacy apparently touch not only criminals but also reputable people whose only offense is political, social, or ideological nonconform-

|  | Total | Federal | State |
|---|---|---|---|
| Facility or place authorized in application |  |  |  |
| Residence | 135 | 10 | 125 |
| Apartment | 68 | 7 | 61 |
| Multiple dwelling | 14 | 3 | 11 |
| Business establishment | 71 | 10 | 61 |
| Business & living quarters | 5 | 2 | 3 |
| Other | 9 | 1 | 8 |
| Average number of intercepts per authorized device | 641 | 1,498 | — |
| Average number of persons involved per wiretap | 116 | 152 | — |
| Total number of intercepts (approx.) | 178,300 | 44,900 | 133,300 |
| Total number of persons involved (approx.) | 13,400 | 4,560 | 8,880 |

Based on Report on Applications for Orders Authorizing or Approving the Interception of Wire or Oral Comunications for the Period January 1, 1969, to December 31, 1969, Administrative Office of the United States Courts.

What number of interceptions are made in cases which involve the so-called "national security" is not known.

[8] See Hearings on the Computer and Invasion of Privacy before a Subcommittee of the House Committee on Government Operations, 89th Cong., 2d Sess. (1966); Address of Cong. Gallagher, Technology and Society: A Conflict of Interest?, 115 Cong. Rec. 8239; Privacy and the National Data Bank Concept, H. R. Rep. No. 1842, 90th Cong., 2d Sess. (1968); Hearings, pursuant to S. Res. 39, on Invasions of Privacy (Government Agencies) before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, 89th Cong., 1st Sess., pt. 2 (1965). The hearings being conducted by Senator Ervin before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary have not as yet been concluded.

ity.    As stated in A. Westin, Privacy and Freedom 365–366 (1967):

> "As of the 1960's, the new surveillance technology is being used widely by government agencies of all types and at every level of government, as well as by private agents for a rapidly growing number of businesses, unions, private organizations, and individuals in every section of the United States."