Raymond M. WALSH, Petitioner,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents.

Rail Carrier Members of the Traffic Executive Association-Rail TEA–ER and Rail Carrier Members Executive Committee-Western Rail Traffic Assoc. EC–WRTA and Southern Freight Assoc., Intervening Respondents.

No. 82–2351.

United States Court of Appeals, Seventh Circuit.

Argued April 21, 1983.

Decided Dec. 13, 1983.

Rehearing Denied Jan. 23, 1984.

Richard S.M. Emrich, Belnap, Spencer & McFarland, Chicago, Ill., for petitioner.

Louis Mackall, I.C.C., Washington, D.C., for respondents.

Jeffrey S. Berlin, Verner, Liipfert, Bernhard & McPherson, Chtd., Washington, D.C., for intervening respondents.

Before POSNER, COFFEY and NICHOLS, Circuit Judges.*

COFFEY, Circuit Judge.

Petitioner, Raymond Walsh, petitions this court to review a decision by the Interstate Commerce Commission to dismiss the petitioner's complaint, alleging a denial of protective arrangements under section 219(g) of the Staggers Rail Act of 1980, 49 U.S.C. § 10706 note (Supp. IV 1980), for lack of jurisdiction. Based upon our interpretation of *Western Railroads-Agreement,* 364 I.C.C. 782 (1981) and *New York Dock Railway-Control-Brooklyn Eastern District Terminal,* 360 I.C.C. 60 (1979), we affirm the decision of the Interstate Commerce Commission.

I.

Petitioner, Raymond Walsh, was employed by the Uniform Classification Committee ("UCC") from October 7, 1967 to June 30, 1981. At the time in question, the UCC was a railroad rate bureau that conducted collective rate-making activities, including the regulation of interchange arrangements and the setting of rate levels, under statutory antitrust immunity. Between September, 1969, and March, 1979, Walsh served as a non-union, salaried, "special representative" for the UCC, formulating rules governing the packing of fresh fruits and vegetables and loading of the same into rail cars for transportation. On March 21, 1979, the Interstate Commerce Commission ("ICC") deregulated the rail transportation of fresh fruits and vegetables and soon thereafter the UCC discontinued its rate-making activities in that industry. Though Walsh's rule-formulating duties were abolished, the ICC retained

Walsh as a "special representative" until his discharge on June 30, 1981.

On November 25, 1981, Walsh filed a complaint with the ICC alleging that as an employee of the UCC, a railroad rate bureau, he fell within the parameter of section 219(g) of the Staggers Rail Act of 1980, 49 U.S.C. § 10706 note (Supp. IV 1980), ("section 219(g)") which provides:

"The Interstate Commerce Commission shall require rail carrier members of a rate bureau to provide the employees of such rate bureau who are affected by the amendments made by this section with fair arrangements no less protective of the interests of such employees than those established pursuant to section 11347 of Title 49, United States Code . . . . "

Walsh claimed that the ICC's deregulation of rail transportation for fresh fruits and vegetables caused the termination of his employment, thus "affecting" him within the meaning of section 219(g) and entitling him to protective arrangements.

On March 12, 1982, the ICC, Review Board Number 3, dismissed Walsh's complaint, ruling that the issue "requires a factual determination of the connection between the Staggers Act and complainant's [Walsh] dismissal. The Commission does not have jurisdiction to make such a determination." *Walsh v. Uniform Classification Committee,* I.C.C. Decision No. 38741 at 2 (March 12, 1982). Walsh appealed the decision, and on August 4, 1982, the ICC, Division Number 1, Acting as an Appellate Division, dismissed "the complaint for lack of jurisdiction." *Walsh v. Uniform Classification Committee,* I.C.C. Decision No. 38741 at 3 (August 4, 1982). The Board based its decision on *Western Railroads-Agreement,* 364 I.C.C. 782 (1981) (*"Western "*), wherein the ICC interpreted section 219(g) to require that the conditions set forth in *New York Dock Railway-Control-Brooklyn Eastern District Terminal,* 360 I.C.C. 60 (1979) (*"New York Dock "*), be applied to rate

---

* The Honorable Philip Nichols, Jr., Circuit Judge of the United States Court of Appeals for the Federal Circuit, is sitting by designation.

bureau employees who were "affected," within the meaning of section 219(g). The *New York Dock* conditions provided that Walsh was to submit his factual dispute to arbitration, in order to determine whether the ICC's deregulation of the transportation of fresh fruits and vegetables actually caused the termination of his employment.

On August 27, 1982, Walsh petitioned this court to review the ICC's decision. The sole issue before us is whether the ICC has jurisdiction over a non-union rate bureau employee's complaint that he was "affected" by a reduction in rate bureau activity and is thereby entitled to protective arrangements under section 219(g) of the Staggers Rail Act of 1980.

## II.

Petitioner contends that the ICC has jurisdiction over his complaint because the ICC's decision in *Western* did not impose *New York Dock* conditions on employees of railroad rate bureaus and alternatively, if the ICC did impose *New York Dock* conditions on such employees, the arbitration provision contained therein does not apply to petitioner because he is a non-union employee who never agreed to that condition.

■ We initially set forth the standard of review that this court applies when reviewing an ICC decision. 5 U.S.C. § 706 provides in pertinent part, that a reviewing court may only:

"(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law . . . ."

*Humko Products Division of Kraft, Inc. v. ICC,* 715 F.2d 360, 363 (7th Cir.1983). Accord *Bowman Transportation, Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 284, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); *Indiana Harbor Belt Railroad Company v. General American Transportation Corporation,* 577 F.2d 394, 397 (7th Cir.1978). The reviewing court must refrain from weighing the evidence, and instead "inquire into the soundness of the reasoning by which the Commission reaches its conclusions only to ascertain that the latter are rationally supported." *Humko Products Division of Kraft, Inc. v. ICC,* 715 F.2d at 363 (quoting *United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. 742, 749, 92 S.Ct. 1941, 1946, 32 L.Ed.2d 453 (1972)). To this we add that deference is due the ICC's construction of a statute committed to its administration. *See, e.g., Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969); *Illinois Central Gulf Railroad Company v. ICC,* 702 F.2d 111, 114 (7th Cir.1983). From this perspective, we address petitioner's first contention that *Western* does not impose *New York Dock* conditions upon railroad rate bureau employees.

■ Section 219(g) requires the ICC to provide employees of rate bureaus with fair arrangements no less protective than those established pursuant to 49 U.S.C. § 11347. In *Western,* the ICC found the arrangements established pursuant to 49 U.S.C. § 11347 to be the conditions set forth in *New York Dock:*

"It is clear that Congress intended that affected employees of these [rate] bureaus are to have at least the same minimum protections as granted to rail employees affected by mergers, acquisitions, consolidations and similar transactions. These protections developed pursuant to 49 U.S.C. § 11347 are set forth in *New York Dock.*"

*Western,* 364 I.C.C. at 784. In addition, the United States Court of Appeals for the Second Circuit stated that in *New York Dock* "[t]he ICC . . . formulated a definitive set of employee protective conditions, which it conceived to be 'commensurate with our statutory [49 U.S.C. § 11347] obligation.'" *New York Dock Railway v. United States,* 609 F.2d 83, 91 (2nd Cir.1979). Accordingly, we do not dispute the ICC's determination that the minimum protective arrangements established pursuant to 49 U.S.C. § 11347 are, in fact, the *New York Dock* conditions.

Having determined that the *New York Dock* conditions are the minimum protective arrangements required by section 219(g), we must now determine if those conditions are "imposed" upon rate bureau employees. Section 219(g) provides that the ICC shall require rail carrier members of a rate bureau to "provide" employees with fair arrangements no less protective than those set forth in 49 U.S.C. § 11347. Petitioner relies upon this language to argue that a requirement to "provide" these arrangements means only that the rate bureau need offer the arrangements, not impose them.

There is ample "rational support," however, for the ICC's conclusion that section 219(g) "imposes" the *New York Dock* conditions. First, section 219(g) requires the protective arrangements established pursuant to 49 U.S.C. § 11347, and thereby the *New York Dock* conditions, as a minimum level of protection for rate bureau employees. The ICC has previously stated that it regards "the formulation of the '*New York Dock* conditions' to be required in order to satisfy the *statutory minimum degree of employee protection* mandated by 49 U.S.C. § 11347." (emphasis added). *New York Dock Railway v. United States,* 609 F.2d at 92. Thus, the *New York Dock* conditions are a threshold minimum level of protection for all rate bureau employees. *Id.* at 101. Secondly, these statutory minimum conditions are self-executing, *Western,* 364 I.C.C. at 784, and apply to all rate bureau employees unless the rate bureau employee and his employer choose to modify the conditions, and submit the same to the ICC for approval.[1] Finally, according to the ICC's language prefacing the conditions set forth in *New York Dock,* "the labor protective conditions to be *imposed* in railroad transactions pursuant to 49 U.S.C. § 11347 *et seq.* ... are as follows" (emphasis added) *New York Dock,* 360 I.C.C. at 84. Based upon our interpretation of *Western* and *New*

York Dock we agree with the ICC that *New York Dock* conditions are "imposed" upon railroad rate bureau employees.

We next turn to the petitioner's contention that even if *New York Dock* conditions are imposed, petitioner is not required to submit his dispute to arbitration because as a non-union employee he never agreed to the *New York Dock* conditions. We refer to the language of *New York Dock* which provides in pertinent part:

> "11. In the event the railroad and its employees or their authorized representatives cannot settle any dispute or controversy with respect to the interpretation, application or enforcement of any provision of this appendix, ... within 20 days after the dispute arises, it may be referred by either party to an arbitration committee."

We initially note that though the phrase "may be referred by either party to an arbitration committee" would ordinarily connote discretion, this court stated in *United States v. Cook,* 432 F.2d 1093 (7th Cir. 1970), *cert. denied,* 401 U.S. 996, 91 S.Ct. 1224, 28 L.Ed.2d 535 (1971):

> " 'May' ordinarily connotes discretion, but neither in lay nor legal understanding is the result inexorable. Rather, the conclusion to be reached 'depends on the context of the statute, and on whether it is fairly to be presumed that it was the intention of the legislature to confer a discretionary power or to impose an imperative duty.' "

432 F.2d at 1098 (quoting *Thompson v. Clifford,* 408 F.2d 154, 158 (D.C.Cir.1968)). In this instance, because the ICC drafted the arbitration provision pursuant to Congressional authority, we must determine the ICC's intention in using the word "may."

The phrase, "may be referred by either party to an arbitration committee" is traceable historically to section 8 of the *Oklaho-*

---

1. According to the ICC, if the rate bureau employee and his employer "seek to modify the [*New York Dock*] ... conditions, the agreement must be submitted to the [ICC] for ... approval. Moreover, the submission must indicate how the agreement differs from the *New York Dock* conditions." *Western,* 364 I.C.C. at 784.

ma conditions.[2] *New York Dock Railway v. United States,* 609 F.2d at 88. Commenting on that phrase, the ICC stated:

"[P]aragraph 8 of the *Oklahoma* conditions . . . contemplates arbitration of disputes with respect to claims arising by virtue of certain of the conditions.

\*   \*   \*   \*   \*   \*

In our opinion, fairness and equity require adoption . . . of the condition . . . with respect to arbitration, which will make *mandatory* the submission to binding arbitration of disputes not settled by agreement between the carrier and the employee." (emphasis added).

*Southern Railway Company-Control-Central of Georgia Railway Company,* 317 I.C.C. 557, 566 (1962) *modified,* 317 I.C.C. 729 (1963). From this language, it is evident that the ICC intended the phrase "may be referred by either party to an arbitration committee" to connote mandatory arbitration. *Accord New York Dock Railway v. United States,* 609 F.2d at 87–89.

Moreover, the United States Supreme Court, when interpreting a similar provision of the Railway Labor Act,[3] stated, "This language is unequivocal. Congress has set up a tribunal to handle minor disputes which have not been resolved by the parties themselves." *Brotherhood of Railway Trainmen v. Chicago River & Indiana Railroad Co.,* 353 U.S. 30, 34, 77 S.Ct. 635, 637, 1 L.Ed.2d 622 (1957). *See also Brotherhood of Locomotive Engineers v. Louisville & Nashville Railroad Co.,* 373 U.S. 33, 38, 83 S.Ct. 1059, 1062, 10 L.Ed.2d 172 (1963); *Chicago, Milwaukee, St. Paul and Pacific Rail-*

*road Co. v. Brotherhood of Locomotive Firemen and Enginemen,* 397 F.2d 541, 543 (7th Cir.1968), *cert. denied,* 393 U.S. 1022, 89 S.Ct. 630, 21 L.Ed.2d 566 (1969); *New Orleans and Northwestern Railroad Co. v. Bozeman,* 312 F.2d 264, 268 (5th Cir.1963). Based upon the deference due the ICC's interpretation of its own language and the Supreme Court's directive we conclude that the *New York Dock* conditions impose mandatory arbitration for disputes such as petitioner's that require a factual determination of whether or not a rate bureau employee's dismissal was caused by the ICC's deregulation of a rate bureau industry.

We fail to understand how petitioner's status as a non-union employee is of any consequence. *See, e.g., Haskell H. Bell v. Western Maryland Railway Co.,* 366 I.C.C. 64, 67 (1981); *Great Northern Pacific & Burlington Lines, Inc.-Merger, etc. Great Northern Railway Co.,* 331 I.C.C. 228, 278 (1967); *Pennsylvania Railroad Co.-Merger-New York Central Railroad Co.,* 327 I.C.C. 475, 544 (1966). The ICC expressly provided in Article IV of the *New York Dock* conditions:

"Employees of the railroad who are not repesented [sic] by a labor organization shall be afforded substantially the same levels of protection as are afforded to members of labor organizations under these terms and conditions.

In the event any dispute or controversy arises between the railroad and an employee not represented by a labor organization with respect to the interpreation [sic], application or enforcement of any provision hereof which cannot be settled

**2.** Section 8 of the *Oklahoma* conditions provided:

"In the event that any dispute or controversy arises with respect to the protection afforded by the foregoing conditions Nos. 4, 5, 6, and 7, which cannot be settled by the carriers and the employee, or his authorized representatives, within 30 days after the controversy arises, *it may be referred, by either party, to an arbitration committee* for consideration and determination, the formation of which committee, its duties, procedures, expenses, et cetera, shall be agreed upon by the carriers and the employee, or his duly authorized representative." (emphasis added).

*Oklahoma Railway Company Trustees Abandonment of Operation,* 257 I.C.C. 177, 200 (1944).

**3.** 45 U.S.C. § 153, First (i) provided in pertinent part:

"but, failing to reach an adjustment in this manner, the disputes *may be referred by petition of the parties or by either party to the appropriate division of the [National Railroad] Adjustment Board* with a full statement of the facts and all supporting data bearing upon the disputes." (emphasis added).

by the parties within 30 days after the dispute arises, either party may refer the dispute to arbitration.

*New York Dock,* 360 I.C.C. at 90. This language differs from the mandatory arbitration provision of Article I, Section 11, only in the amount of time that one must wait before referring a dispute to arbitration. Accordingly, we hold that Article IV of the *New York Dock* conditions imposes mandatory arbitration upon non-union rate bureau members and that in this instance, the ICC lacks jurisdiction to hear petitioner's complaint.

This holding is in line with strong Federal policy which favors arbitration of labor disputes whether mandated by statute or by contractual agreement. *See, e.g., Gateway Coal Co. v. United Mine Workers of America,* 414 U.S. 368, 381–82, 94 S.Ct. 629, 638–639, 38 L.Ed.2d 583 (1974). It allows the ICC to perform its intended function of regulating interstate commerce without the added burden of having to resolve arbitrable disputes. It also supports the ICC's position that when "[they] have specifically prescribed arbitration as the remedy for employee complaints, [they] no longer have authority to become involved in disputes between a railroad and individual parties arising out of the protective conditions." *Haskell H. Bell v. Western Maryland Railway Co.,* 366 I.C.C. at 67.

### III.

We affirm the Interstate Commerce Commission's decision that the Commission lacks jurisdiction over petitioner Walsh's claim.