UNITED HOSPITAL CENTER, INC., a private, non-profit corporation; Reynolds Memorial Hospital, Inc., a private, non-profit corporation; Davis Memorial Hospital, Inc., a private, non-profit corporation; St. Joseph's Hospital of Parkersburg, a private, non-profit corporation, Appellees,

v.

Sally K. RICHARDSON; William L. Gilligan; Larry C. Fizer and West Virginia Health Care Cost Review Authority, Appellants,

and

John D. Rockefeller, IV, Governor of the State of West Virginia; Chauncey H. Browning, Attorney General of the State of West Virginia; The West Virginia Department of Health, a Department of the State of West Virginia; L. Clark Hansbarger, Director of the State Department of Health; The Office of the Assistant Commissioner of Medical Services for the West Virginia Department of Welfare and David W. Forinash, Assistant Commissioner of Medical Services for the West Virginia Department of Welfare, Defendants.

UNITED HOSPITAL CENTER, INC., a private, non-profit corporation; Reynolds Memorial Hospital, Inc., a private, non-profit corporation; Davis Memorial Hospital, Inc., a private, non-profit corporation; St. Joseph's Hospital of Parkersburg, a private, non-profit corporation, Appellees,

v.

The WEST VIRGINIA DEPARTMENT OF HEALTH, a Department of the State of West Virginia; L. Clark Hansbarger, Director of the State Department of Health; The Office of the Assistant Commissioner of Medical Services for the West Virginia Department of Welfare; David W. Forinash, Assistant Commissioner of Medical Services

for the West Virginia Department of Welfare, Appellants,

and

John D. Rockefeller, IV, Governor of the State of West Virginia; Chauncey H. Browning, Attorney General of the State of West Virginia; Sally K. Richardson; William L. Gilligan; Larry C. Fizer and West Virginia Health Care Cost Review Authority, Defendants.

Nos. 84–1062, 84–1088.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 3, 1984.

Decided March 20, 1985.

John H. Kozak, General Counsel, West Virginia Health Care Cost Review Authority, Charleston, W.Va. (Chauncey H. Browning, Atty. Gen., William F. Carroll, Deputy Atty. Gen., Charleston, W.Va., on brief), for appellants.

Robert J. O'Neil, Charleston, W.Va. (George G. Guthrie, Spilman, Thomas, Battle & Klostermeyer, Charleston, W.Va., on brief), for appellees.

Before RUSSELL, WIDENER and PHILLIPS, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

This is an action by four West Virginia private non-profit hospitals to enjoin the enforcement of sections 16–29B–4 and 16–29B–27 of the West Virginia Health Care Review Act, W.Va.Code § 16–29B–1, *et seq.* (Supp.1984) (hereafter "Act") and any regulations promulgated thereunder by the West Virginia Health Care Cost Review Authority created to implement and administer the Act and for a declaratory judgment of the unconstitutionality of such sections.

The original defendants in the action were the Governor and Attorney General of West Virginia, the West Virginia Department of Health and its director, and the Office of Assistant Commissioner of Medical Services for the West Virginia Department of Welfare and the Individual Assistant Commissioner. Jurisdiction was predicated on 28 U.S.C. §§ 1331 and 1343 (1983), in support of claims under 42 U.S.C. § 1983, and 28 U.S.C. § 2201, *et seq.*

Prior to the filing of an answer by the named defendants, the district judge, on motion of the plaintiffs, entered a temporary restraining order against the enforcement of the challenged sections, and later, after the original defendants had answered, a preliminary injunction to the same effect was granted. Thereafter, by stipulation, the Governor and Attorney General were dismissed as defendants and the Au-

thority and its individual members were added as defendants. The Secretary of the United States Department of Health and Human Services was also permitted (actually requested) to file a memorandum of position as an *amicus curiae.* After a hearing on the merits, the district judge entered an order granting the plaintiffs declaratory judgment of invalidity of section 4 of the Act.[1] The defendants have appealed. We reverse.

The beginning point for a review of the judgment is the Act itself. As stated in its preamble, the purpose of the legislation was to establish a complex, integrated system for restraining "unreasonable increases in the costs of acute care hospital services" in the State of West Virginia.[2] In effectuating this purpose, it created an Authority, composed of three members. The Authority (later described as board)[3] was to develop and promulgate a uniform system of accounting and reporting for all State acute care hospitals and to establish a schedule of rates for the hospitals. In the discharge of this responsibility it was expressly authorized to develop rules and regulations to administer the provisions of this section.[4] The Act, also, granted power to the board to employ a staff, including general counsel to represent it in "all adjudicatory matters," and to "contract with third parties."[5]

While the Act became effective as of March 12, 1983, jurisdiction of the board over "rates for health services care" did not arise until July 1, 1984. Section 16–29B–4 which is the object of the plaintiffs' attack, was enacted to govern health service charges by State acute care hospitals in the interim period between the effective date of the Act and the date after the

---

1. Section 16–29B–27 is the penalty section of the Act. Since the district court found the substantive section invalid, the attack on the penalty section became moot.

2. W.Va.Code § 16–29B–1.

3. While § 16–29B–5, which provides for the creation of the administering agency, describes such agency as "Authority," the statute states that it is "hereinafter referred to as the board,"

and we later follow this suggestion and refer to the "Authority" as the "board."

4. Section 16–29B–4 concluded with this statement:

"The board shall have authority to develop rules and regulations to administer the provisions of this section."

5. W.Va.Code § 16–29B–7(b), (c).

assumption of jurisdiction over such rates by the board and the issuance of initial rates for the hospitals. Such section freezes during this interim period "[a]ll rates for hospital services" as of February 1, 1983 "except as adjustments are provided in this article." It proceeds significantly to provide that, though there was the general "freeze," the board or the director of the state department of health were "empowered to approve temporary rate increases for hospitals subject to the provisions of this article, in accordance with the provisions of section twenty-one, subsection (c) of this article." Subsection 16–29B–21(c) confers on the board, "[w]hether before or after" its jurisdiction to fix rates arises on July 1, 1984, "discretionary authority to allow a temporary change in a hospital's rates which may be effective immediately upon filing and in advance of review procedures when it has been determined that such temporary rate changes are in the public interest, and are necessary to prevent insolvency, to maintain accreditation or for emergency repairs or to relieve undue financial hardship." Section 4 also sets a "cap" of "twelve percent per annum" on any increase in a hospital's "gross patient revenues," subject to the provision that "[a]ny hospital altering its payor mix by increasing or decreasing the proportion of medicare, medicaid or charity care patients during this period shall have its allowed twelve percent per annum increased or decreased in proportion to the change in its patient mix. Any hospital whose gross patient revenues exceed those allowed as set forth in this section shall pay back the excess to the board."

The Legislature clearly recognized that Medicare and Medicaid rates presented special problems in establishing both interim and permanent rates and required special treatment. It sought to meet this problem by its grant of authority to the board and by subsections (d) and (e) of § 16–29B–16, as well as by the language of section 4 relating to the "cap" on patient care reserve which was to be prorated in connection with Medicare and Medicaid patients. The subsections of section 16 provided that the board should "[u]pon appointment" of its members, seek approval for reimbursement to hospitals under the Medicare and Medicaid programs in accordance with rates approved by the board and to this end was charged with the responsibility "[o]n or before" June 1, 1984, of submitting to the Secretary of Health and Human Services application for approval of such rates.

Immediately after their appointment and qualification, the members of the board began the preparation of rules and regulations to be followed in the administration of the Act both during the interim period and for the period after the issuance of the initial rate schedule by the board. These rules and regulations were revised a time or two but in the final, approved revision, they were submitted for public hearing in accordance with state procedures. Thereafter, they were filed with and approved by the appropriate legislative rule-making review committee as required under § 29A–3–11 of the West Virginia Code (Supp. 1984). As approved by the designated legislative committee, such rules and regulations were then approved in formal legislation by the full Legislature.

It is the position of the plaintiffs that both the provision of section 4 freezing (subject to adjustment as provided in that section) the rates charged by them in the interim period between the enactment of the Act and the date when the board created under the Act issues its initial rate schedules for each hospital as well as the provision of the same section restricting increases in annual gross patient revenue of the hospitals to "twelve percent per annum" are violative of the supremacy and due process clauses of the federal Constitution, in that they contradict the clear language of the medicare and medicaid provisions of the Social Security Act.[6] Under this Act a State which has elected to participate in the Medicare and Medicaid pro-

---

6. For an excellent review of the Medicaid and Medicare programs *see Charleston Memorial* *Hospital v. Conrad,* 693 F.2d 324, 326–327 (4th Cir.1982).

grams, Title XVIII (42 U.S.C. § 1395, *et seq.*) and Title XIX (42 U.S.C. § 1396 *et seq.*) of the Social Security Act, and thereby to receive matching funds from the federal government must develop a "State plan" which sets the rates of reimbursement for services rendered both Medicare and Medicaid patients which comply with certain federal standards. West Virginia had elected to participate in those programs and was accordingly obligated to comply with the requirements of the federal statutes as stated in 42 U.S.C. § 1396a(a)(13)(A). It is these federal requirements which the plaintiffs contend section 4 of the Act contravenes.

The Secretary of Health and Human Services, however, has filed in the proceedings her "Memorandum of Law as Amicus Curiae," in which she stated her opinion that Section 4 of the State Act, as applied under the board's regulations, was in conformity with and not in violation of the federal Medicare and Medicaid programs. In this opinion, she summarized her position on the constitutional validity of the Act as follows:

> In the Secretary's view, the provisions of W.Va.Code § 16–29B–4 and implementing regulations do not on their face violate federal statutes or regulations under the Medicare and Medicaid programs. Under West Virginia's statute and regulations hospitals continue to receive the full reimbursement to which they are entitled under the Medicare and Medicaid programs. The fact that hospitals may be subject to a limit on overall revenues would not seem to affect compliance with the statutory and regulatory requirements of Titles XVIII and XIX of the Act. In addition, W.Va.Code § 16–29B–4 provides for an adjustment to the allowable twelve percent per annum increase to reflect an increase (or decrease) in the proportion of Medicare, Medicaid or charity patients, which would seem to avoid any problem of cost shifting."

On this record, however, the district judge found that the "freeze" on hospital rates as stated in section 4 of the Act represented "a significant change in repayment methodology" for Medicaid and Medicare patients and constituted "a significant state intervention in the federal repayment system for Medicare" even though the "State [had] taken no action toward gaining federal approval for its proposed [interim] regulation[s.]..." It concluded, therefore, that "[w]ithout compliance with the federal procedural requirements, section four conflicts with federal law and is unenforceable." On the "cap" in patient revenue of hospitals, which the district court declared was "the most troublesome aspect of section four," it said:

> "The natural, resulting effect of the limit on gross patient revenues is to threaten the adequate delivery of health services, at any cost, to all West Virginians, of every economic strata and regardless of age or geographic location. All Plaintiff hospitals presented testimony to the effect that changes in their respective operations to meet the effects of this legislation will include curtailment in services to charity patients. For example, these patients raise 'gross patient revenues' without a resulting increase of cash flow to the servicing hospital."

It dismissed the Secretary's approval of the Act and its procedures for interim operation under the Act with the comment that "the Court is not satisfied that the Secretary's conclusion is in accord with the Section I through III of her submission." Sections I through III, as referred to in the district court's order, covered the Secretary's introductory statement of the requirements of the federal law under the Medicaid and Medicare statutes as imposed upon participating states. It found, though, that "[t]here [was] no correlative requirement for agreement with any federal agency, including the Department of Health and Human Services, concerning the interim regulatory activities that had its inception with the passage of the health care cost review legislation.... The Court is of the opinion that this oversight is fatal to the legitimacy of challenged section 4." The district court accordingly granted the plaintiffs' motion for a declaratory judg-

ment "that Section 4 of Article 29B, of Chapter 16 of the Code of West Virginia is ... unconstitutional and void."

 The dispositive issue on the appeal from this judgment is the constitutionality of a single section in a comprehensive state statute (i.e., section 4 of the Act). However, it is a familiar rule that the constitutionality of a part of an act or statute is not to be resolved in isolation from other parts of the statute and from the purposes of the statute as a whole, particularly if the section in question refers to or embraces other sections of the Act (as does the section under review). *Weinberger v. Hynson, Westcott & Dunning,* 412 U.S. 609, 631–632, 93 S.Ct. 2469, 2484, 37 L.Ed.2d 207 (1973). As the Court said in *Kokoszka v. Belford,* 417 U.S. 642, 650, 94 S.Ct. 2431, 2436, 41 L.Ed.2d 374 (1974): "When 'interpreting a statute, the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute (or statutes on the same subject) and the objects and policy of the law, as indicated by its various provisions, and give to it such a construction as will carry into execution the will of the Legislature'...." (quoting *Brown v. Duchesne,* 60 U.S. (19 How.) 183, 194, 15 L.Ed. 595 (1856)). For, after all, it is the court's task to "interpret the words of [the statute] in light of the purposes [the Legislature] sought to serve," *Dickerson v. New Banner Institute, Inc.,* 460 U.S. 103, 118, 103 S.Ct. 986, 994, 74 L.Ed.2d 845 (1983), (quoting *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979)) and to arrive at a construction which is "most harmonious" with the statutory scheme and general purpose, *Commissioner v. Engle,* 464 U.S. 206, ——, 104 S.Ct. 597, 604, 78 L.Ed.2d 420, 429 (1984) (quoting *NLRB v. Lion Oil Co.,* 352 U.S. 282, 297, 77 S.Ct. 330, 338, 1 L.Ed.2d 331 (1957) (Frankfurter, J., concurring in part

and dissenting in part)). And, if a statute is enacted to co-exist with another statute, that fact is to be considered and given effect if possible. *Kokoszka v. Belford, supra,* 417 U.S. at 650, 94 S.Ct. at 2436.[7] Should there be some inconsistency between the two statutes or sections of a single statute, courts, in construing the statutes, so far as it is possible, should seek to steer a "middle course that vitiates neither provision but implements to the fullest extent possible the directives of each." *Citizens to Save Spencer County v. EPA,* 600 F.2d 844, 871 (D.C.Cir.1979).

 Where the statute (as does the statute here) authorizes the implementing or administering agency to issue such rules or regulations as may be appropriate or necessary, such regulations are to be sustained so long as they are "reasonably related to the purposes of the enabling legislation," and are to be given consideration by a reviewing court. *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 1661, 36 L.Ed.2d 318 (1973) (quoting *Thorpe v. Housing Authority of the City of Durham,* 393 U.S. 268, 280–281, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969)). Moreover, in determining whether the regulations are within the purpose of the enabling legislation, the courts "give great deference to the interpretation given the statute by the officers or agency charged with its administration." *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). And if such regulations have been reported to the legislative oversight committee or the legislature itself, which has not disavowed or disapproved them, they are entitled to considerable weight as expressive of the legislative purpose in enacting the statute and in interpreting the statute. *United States v. Sheffield Bd. of Comm'rs,* 435 U.S. 110, 131–132, 98 S.Ct. 965, 979, 55 L.Ed.2d 148 (1978); see *Ruhe v. Bertland,* 683 F.2d

---

7. In the cited case, it was said that the drafters of the Consumers Credit Protection Act "were well aware that the provisions and the purposes of the Bankruptcy Act and the new legislation would have to co-exist." 417 U.S. at 650, 94

S.Ct. at 2436. For that reason the Court said that the two Acts were to be considered in determining the meaning and validity of the new statute.

102, 104–105 (4th Cir.1982) (per curiam); *Fredericks v. Kreps,* 578 F.2d 555, 563 (5th Cir.1978) (enbanc).[8] This rule is particularly applicable where the legislature has not disapproved but in fact has specifically approved the regulations, as did the legislature in this case. In such a situation, it can be fairly said that the legislature has in effect incorporated the regulations in the statute.

■ The basic fault in the district court's reasoning is that it sought, contrary to the authorities earlier cited, to look to the language of section 4 in isolation, without taking into account other sections of the Act considered as a whole, particularly those sections which, by the express language of section 4, qualified the scope and application of the latter section, and without considering at all the regulations issued thereunder by the board and approved explicitly by the legislature. Thus, the "freeze" of rates, as provided in section 4, is by the terms of the section subject to the authority granted under section 21(c) "to allow a temporary change in a hospital's rate." That power is not restricted to the period after the issuance of initial rate schedules by the board; it applies both to "before" and "after" the issuance of such schedules, thus to both interim and to permanent rates. In exercising its authority, as provided in section 4 "to develop rules and regulations to administer the provisions of this section," and as provided in section 21(c) of the Act, the board has made special provisions in this interim period for increases in rates for Medicare and Medicaid patients. Sections 4.01.01(b) and 5.02(b) of the regulations provide that any rate changes "for changes in cost reimbursement agreements or contracts" are effective "upon filing of the application."[9] As explained in the testimony of a member of the board, "the intent of the Authority [by such regulations] was to allow Medicare costs reimbursement agreements and Medicaid costs reimbursement agreements to be reached [or allowed] without being subject to being reviewed by the Authority, until that time when the Authority obtains the Medicare waiver." It is thus clear that there is no interim "freeze" of Medicaid or Medicare hospital rates prior to approval by the Department of Health and Human Services. In short, the Act taken as a whole and particularly the regulations issued thereunder by the board sought to achieve absolute compliance with the Social Security Act, of which all were well aware and compliance with which was always intended, as sections 16(d) and (e) of the Act plainly manifest. *See Kokoszka v. Belford,* 417 U.S. at 650, 94 S.Ct. at 2436.

■ The plaintiffs offer a number of objections to this argument of the defendants that Medicare and Medicaid reimbursements contracts have been effectively excluded from the freeze of hospital rates in section 4, both by the qualifying language of the section itself and by the regulations issued by the board under the express authorization granted it by the section. The first of these objections is that, though the hospital may automatically on the filing of notice of the increase put the proposed rate increase into effect, the regulations are invalid simply because under

---

**8.** In *Ruhe,* we said:

"But once an agency's statutory construction has been 'fully brought to the attention of the public and Congress,' and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned." (quoting *United States v. Rutherford,* 442 U.S. 544, 554 n. 10, 99 S.Ct. 2470, 2476 n. 10, 61 L.Ed.2d 68 (1979))[12]

In *Fredericks,* the court said:

"Our determination that EDA's regulations are consistent with the intent of Congress is reinforced by the fact that Congressional oversight committees acquiesced in EDA's regulations and guidelines before they were put into effect. Hearings were held in May 1977, and the regulations and guidelines were allowed to become operative. That the careful review of these committees found the regulations and guidelines to be consistent with the congressional intent lends the firmest possible support to our conclusion."

**9.** "Cost reimbursement agreement or contract" is a term which is generally used to include Medicare and Medicaid programs, as § 2.05 of the rules and regulations recognizes.

this automatic procedure the hospital must give notice of its intention to increase rates. Like the Secretary, we find no unconstitutional imposition by such a purely formal requirement.

 The second objection is that the regulations, as originally drafted, provided that rate adjustments put into effect immediately under the regulations were by other terms of the regulations "[s]ubject to refund or reduction or both if the hospital fails to meet the criteria and standards necessary for a rate change." [10] If we look at the Act as a whole, it would seem reasonable to conclude that this provision for "refund or reduction" was not intended to apply to adjustments made in connection with Medicare or Medicaid charges. And that this is so was made plain in the final revision of the relevant regulation, § 4.01.-01(d):

"(d) *Except for applications concerning federal medicaid and medicare,* rates put into effect immediately may be:

"(1) Suspended. . . ." (Italics added)

 Plaintiffs would also find that the provision in § 5.02(b) for "pass-through" of Medicaid and Medicare rate increases is discretionary with the board as evidenced by the use of the word "may." While the term "may" in a statute or agency regulation dealing with agency power is generally construed as permissive rather than mandatory, the construction of such term—whether discretionary or mandatory—is reached in every case "on the context of the statute [or regulation], and on whether it is fairly to be presumed that it was the intention of the legislature [or agency] to confer a discretionary power or to impose an imperative duty." *Thompson v. Clifford,* 408 F.2d 154, 158 (D.C.Cir.1968 (quoting *United States ex rel. Siegel v. Thoman,* 156 U.S. 353, 359, 15 S.Ct. 378, 380, 39 L.Ed. 450 (1895)); *United States v. Cook,* 432 F.2d 1093, 1098 (7th Cir.1970), *cert. denied,* 401 U.S. 996, 91 S.Ct. 1224, 28 L.Ed.2d 535 (1971). This view is in conformity with the rule stated in 1A C. Sands,

Sutherland Statutory Construction, § 25.03, at 299 (4th 1972), that in determining the proper interpretation in a statute of the words "may" and "shall" it is the intention of the legislature or the proper regulatory agency, which "should be controlling" and that "no formalistic rule of grammar or word form should stand in the way of carrying out [this] legislative intent." Thus, in a proper case "shall" may properly be construed as permissive, *Town of Nottingham v. Harvey,* 120 N.H. 889, 895, 424 A.2d 1125, 1129 (1980); *Village of Park Forest v. Fagan,* 64 Ill.2d 264, 268, 1 Ill. Dec. 59, 62, 356 N.E.2d 59, 62 (1976), and "may" as mandatory, *Schwanda v. Bonney,* Me., 418 A.2d 163, 167 (1980); *Kapa Associates v. Flores,* 35 Conn.Sup. 274, 279, 408 A.2d 22, 26; *Value Oil Co. v. Town of Irvington,* 152 N.J.Super. 354, 365, 377 A.2d 1225, 1231 (1977), *aff'd,* 164 N.J.Super. 419, 396 A.2d 1149 (1978) ("Where logic and context are required to meet the ends of justice, however, courts have often interpreted 'may' as connoting a mandatory meaning"); *In re Hardy,* 294 N.C. 90, 95, 240 S.E.2d 367, 371–372 (1978) ("Words and phrases of a statute may not be interpreted out of context, but individual expressions 'must be construed as a part of the composite whole and must be accorded only that meaning which other modifying provisions and the clear intent and purpose of the act will permit' ") (quoting *Watson Indus. v. Shaw,* 235 N.C. 203, 210, 69 S.E.2d 505, 511 (1952)); *Robertson v. South Carolina,* 276 S.C. 356, 358, 278 S.E.2d 770, 771 (1981) ("But when the question arises whether 'may' is to be interpreted as mandatory or permissive in a particular statute, legislative intent is controlling"); *Caputo v. Holt,* 217 Va. 302, 305, 228 S.E.2d 134, 137 (1976) ("In light of that purpose, we construe the word 'may' as used in the second sentence of this statute to be mandatory").

 There can be no question that the board intended the challenged provision in this regulation, even though stated in terms of "may," to be mandatory. The

---

**10.** § 4.01.01(d)(2) of the rules and regulations.

members of the board so declared in their testimony. The purpose of the provision was to assure compliance with the requirements of the Social Security Act. To construe the provision to defeat this purpose would be to nullify the clear intent of the board. We have no difficulty in finding that in this context, the term "may" was mandatory in rendering the regulation consistent with the Social Security Act as was the board's clear intention.

Finally, the district court seems to have assumed that the board did not construe the Act and its regulations as allowing adjustments in the hospital rates for Medicare and Medicaid patients during the interim period, even though that has been the argument of the board throughout this litigation. It bases this on some language, again taken out of context and in isolation, appearing in the testimony of one of the members of the Authority. We do not read the testimony of the witness as does the district court. Mrs. Richardson, the member of the Authority to whose testimony the district court referred, was asked whether section 4 did "initially freeze [hospital rates] *subject to relaxation by the Authority* ..." (Italics added) and her answer was "that's right." Such answer was correct and followed faithfully the language of the Act. Her answer referred to the modifying language in the "freeze" provision, which recognized the power of the Authority to relax the freeze in the interim period. In exercising that "relaxing" power granted under section 21(c) of the Act, Mrs. Richardson went on to explain that the Authority in its regulations had no intent in any way to "change the cost reimbursement contracts or agreements between Medicare and Medicaid and a single hospital in West Virginia." The Authority's intent in its regulations, Mrs. Richardson added, was to pass such increases under a cost reimbursement agreement (i.e., for Medicare and Medicaid charges) "right on through without any need for review or approval by the Authority and issue an order." We discern no inconsistency between this testimony, taken as a whole, and the position of the

defendants on this appeal. As the Secretary of Health and Human Services said in her Memorandum filed with the district court, these provisions of the Act and the regulations of the Authority operated to permit the automatic "pass-through" of all changes in cost reimbursement agreements with any West Virginia hospital and, for that reason, the "freeze" in section 4 did not violate either the Medicare or Medicaid programs.

■ Neither do we find unconstitutional the so-called "cap" on patient care revenues constitutionally infirm. The language of section 4 itself suggests that this "cap" was not applicable until the Act and its proposed initial schedule of rates for Medicaid and Medicare patients were approved by the federal authorities. It cannot be questioned that the regulations issued by the board make clear that this is the effect to be given the "cap" language of section 4. Thus, Section 4.03 of the regulations provides:

"Temporary rate changes granted pursuant to these regulations may result in an adjustment to the amount of gross patient revenue otherwise allowed a hospital in accordance with the regulations of the authority governing the Limitation on Hospital Gross Patient Revenues or during the setting of the hospital's initial rate schedule."

This regulation, as we have said, was submitted to the Legislature and was approved by it. We are unable to perceive any valid reason for not accepting this formal approval of the regulation by the Legislature as establishing the very construction of the statute and its regulations adopted by the Secretary of Health and Human Services. It very definitely protects against the danger envisioned by the plaintiffs.

■ While they do not question the right of the board to issue regulations relating to the administration of the Act (something they could not do in view of the express grant of such authority by the Act) and seemingly recognize that the regulations protect them from the dangers they

perceive in the Act, the plaintiffs do suggest that the regulations go beyond the power of the board under West Virginia law and thus are invalid. They cite in support of this contention a number of West ·Virginia decisions. None of these decisions is on point. In *Anderson & Anderson Contractors, Inc. v. Latimer*, 162 W.Va. 803, 808, 257 S.E.2d 878, 881 (1979), a West Virginia Surface Mining Reclamation regulation was found invalid because it "attempted to make completely retroactive statutory provisions which were clearly intended by the Legislature to have only limited retroactivity." The rationale for the court's decision was that the regulation was at variance with the legislative intent. No such situation exists in this case. The instant regulations have been reviewed and approved by the Legislative oversight committee and by the legislature itself. Such approval carries the manifest seal of legislative intent.

In *Sheppe v. West Virginia Bd. of Dental ·Examiners*, 147 W.Va. 473, 483, 128 S.E.2d 620, 626 (1962), another case cited by the plaintiffs, the board's regulations had not been filed as required by law with the Secretary of State and such failure was declared by the statute to render the regulations "void and of no legal force and effect" under the statute's express provisions. No such situation exists here. There regulations were properly filed.

In *Eastern Gas & Fuel Associates v. Hatcher*, 144 W.Va. 229, 236, 107 S.E.2d 618, 623 (1959), the regulations were found to be "out of harmony" with the enabling statute and actually operated to limit it. The regulations in this case were promulgated in strict conformity with West Virginia statutes and were in "harmony" with the purposes of the Act. Nor do the plaintiffs contend otherwise. That they had conformed to legislative intent has been authoritatively established by the approval given such rules and regulations by the West Virginia legislative oversight committee and by the legislature itself. Since the regulations in this case were clearly "in harmony" with the purposes of the Act and

were expressly authorized, their validity is unassailable.

It follows that we find the statutory provision which the plaintiffs challenge constitutionally valid. The grant of a declaratory judgment that such provision was unconstitutional is, therefore, reversed and the action is remanded to the district court with instructions to dismiss.

REVERSED and REMANDED WITH INSTRUCTIONS.